IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BETTY ALEXIS
et al.,

    Plaintiffs,
v.

JASON KAMRAS,
et al.,

    Defendants.

Civil Action No. 3:19cv543

## MEMORANDUM OPINION

This matter is before the Court on BH Media Group, Inc. ("BH Media")'s MOTION TO QUASH SUBPEONA *DUCES TECUM* TO NEWS ORGANIZATION (ECF No. 20) ("MOTION"). For the following reasons, the MOTION will be denied.

## BACKGROUND

Betty Alexis, Stephanie Burgess, Chireda Cotman, and Troy Johnson (collectively the "Plaintiffs") each brought an action against Defendants Jason Kamras ("Kamras") and the City of Richmond d/b/a/ Richmond Public Schools ("RPS") (collectively the "Defendants"). The operative pleading is the First Amended Complaint ("FAC"). In their respective FACs, Alexis, Cotman, and Johnson assert claims for: a denial of their due process liberty interest in violation of the Fourteenth Amendment to the United

States Constitution (Count I) against Kamras and PRS; and defamation (Count II) and malicious prosecution (Count III) claims against Kamras. Burgess's FAC asserts only two claims: the due process claim (Count I) against Kamras and RPS; and the defamation claim (Count II) against Kamras.

Jurisdiction over Count I, a federal question, lies under 28 U.S.C. § 1331. Jurisdiction over the state law claims in Counts II and III is asserted under 28 U.S.C. § 1367 (supplemental jurisdiction) because they arise out of the same facts as the federal claim.

Although there are some differences in the FACs, those differences are minor. Hence, all three actions were consolidated for all purposes. ORDER, ECF No. 16.

All claims arise out of the Virginia Department of Education's ("VDOE") investigation into Standards of Learning ("SOL") testing irregularities at George Washington Carver Elementary School ("Carver") in June of 2018, and the response to the investigation by RPS Superintendent Kamras, including the "widely-publicized allegations of cheating by teachers and administrators" at Carver. FAC ¶ 1, ECF No. 11.

In particular, Carver conducted SOL testing in May 2018. Alexis, Cotman, and Johnson acted as proctors during that SOL

testing.[1] Soon thereafter, on June 1, 2018, personnel from VDOE began interviewing students, teachers, and administrators at Carver about reported irregularities during that testing. VDOE's visit garnered media attention and, as a result, the Richmond Times-Dispatch published an article titled "Questions remain unanswered about Richmond Carver Elementary School 'potential irregularities' in SOL testing."[2]

On July 30, 2018, VDOE published the "Report on George Washington Carver Elementary School, Richmond Public Schools, 2018 Standards of Learning Test Investigation, July 30, 2018" ("Report"), which identified and summarized various testing irregularities that occurred during the Spring 2018 SOL testing sessions at Carver. The Report identified ten different Carver employees, including the Plaintiffs, and named them as providing or allowing what was described as "inappropriate assistance." FAC ¶ 16, ECF No. 11. The Report also provided a summary of statements "that students had allegedly made about the recent SOL testing during their interviews with VDOE personnel." Id. ¶ 18. In

---

[1] No. 3:19cv544, FAC ¶ 10 ("[Burgess] simply protected for a Reading and Science test."); No. 3:19cv545, FAC ¶ 12 ("Cotman assisted in SOL testing at Carver as a floating proctor."); No. 3:19cv600, FAC ¶ 11 ("Johnson assisted in SOL testing at Carver for one day as a proctor for read-aloud tests.").

[2] ECF No. 11-1. The Richmond Times-Dispatch article can also be located at https://www.richmond.com/news/local/questions-remain-unanswered-about-richmond-s-carver-elementary-school-potential/article_8dcd2390-4bf4-5e5e-8319-c9058f28da73.html).

3

addition, the Report accused Alexis "of trying to get parents to refuse to have their children re-tested by having them sign opt out forms for their children." Id. ¶ 19. Finally, the Report "said that various anonymous sources had reported that a small group of staff members, often referred to as the 'inner circle,' received benefits and privileges from the then-principal of Carver." Id. ¶ 20.

In response to VDOE's investigation and the Report, Kamras and the Richmond School Board allegedly launched a "media campaign designed to lessen the public blow from the VDOC's report and the cheating implications that flowed from it." Pls.' Opp to Mot. to Quash 1, ECF No. 22. Plaintiffs allege that, as part of the media campaign, Kamras and the Richmond School Board published allegedly false public statements about Plaintiffs, "publicly and falsely accusing" them of cheating at Carver. No. 3:19cv544, FAC ¶ 29; No. 3:19cv545, FAC ¶ 31; No. 3:19cv600, FAC ¶ 32.

On the day that VDOE issued its Report, Kamras met with local reporters and read "a prepared statement about the Report in which he essentially vouched in full for the Report." FAC ¶ 21, ECF No. 11. Kamras also published a statement on the RPS's website largely echoing the statement that he had made to local reporters. Additionally, on August 1, 2018, Kamras held a public meeting at Carver and, beforehand, gave a press conference at the school. In that press conference, he allegedly said:

4

> I want to reiterate that what happened at Carver is unconscionable. The adults who orchestrated this systemic cheating violated a sacred trust with our students and our families. Moreover, pending State approval, I can confirm that none of these individuals will hold a teaching or administrative license in the Commonwealth.

Id. ¶ 24.

On August 6, 2018, the School Board "voted to approve the resignations of the former Carver principal and five of its teachers - including Alexis and Cotman]." Pls.' Opp to Mot. to Quash 3, ECF No. 22. On the same day, Kamras gave an interview to Justin Mattingly ("Mattingly"), a reporter at the Richmond Times-Dispatch. Id. at 4. That interview allegedly included information about the Plaintiffs, Carver and VDOE's Report. Id. at 3-4. The Richmond-Times Dispatch published an article about the August 6, 2018 School Board meeting, which included statements that Kamras allegedly made during his interview with Mattingly. Id. Specifically, the article attributed the following statement to Kamras: "'The actions were a betrayal of trust, so they can't work for RPS.'"[3]

---

[3] ECF No. 11-3 (attaching a copy of Mattingly's Richmond-Times Dispatch Article entitled "Carver principal and 5 others resign from Richmond Public Schools after cheating investigation," located at https://www.richmond.com/news/local/carver-principal-and-5-others-resign-from-richmond-public-schools-after-test-cheating-investigation/article_f7ee4f6e-61d2-56f8-a019-3465f21017c8.html).

The FACs were filed on November 12, 2019. In their respective FACs, Plaintiffs state that they did not provide any inappropriate assistance to any of the students at Carver. Alexis and Burgess also allege that, as a result of the "public blame" put upon them by the Defendants, they have suffered various injuries, including the loss of occupational opportunities. In addition, all Plaintiffs allege to have suffered from emotional distress and reputational harm as a result of the Defendants' actions.

During the period allowed for pretrial discovery, Plaintiffs served a subpoena *duces tecum* on the Richmond Times-Dispatch seeking published and unpublished materials about the news stories that addressed or referred to Carver. ECF No. 21-1. The parties have resolved some of BH Media's objections to the Plaintiffs' subpoena. And, by agreement, other objections have been placed in abeyance. At issue here is the demand that BH Media produce "a recording of an interview by the Newspaper on August 6, 2018, of Defendant Jason Kamras, Superintendent, Richmond Public Schools." Memo. in Supp. Mot. to Quash 5, ECF No. 21.

### DISCUSSION

**I. Legal Standard**

Under Fed. R. Civ. P. 45(d)(3)(A), a court must quash or modify a subpoena that "subjects a person to undue burden" or that

6

"requires disclosure of privileged or other protected matter, if no exception or waiver applies."

The First Amendment affords certain protections to news gatherers, including journalists and news organizations. See, e.g., Stickels v. General Rental Co., 750 F. Supp. 729, 731 (E.D. Va. 1990). Within these protections, news reporters enjoy "some constitutional protection of the confidentiality of [their sources]." Pell v. Procunier, 417 U.S. 817, 834 (1974). The First Amendment's protection extends to unpublished materials obtained in the course of newsgathering, including non-confidential information. Stickels, 750 F. Supp. at 732.

However, the First Amendment's protections to the press are not absolute. As the Supreme Court of the United States explained in Branzburg v. Hayes, 408 U.S. 665:

> Nothing before us indicates that a large number or percentage of all confidential news sources falls into either category and would in any way be deterred by our holding that the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task.

Id. at 691. In civil proceedings, "the First Amendment affords a journalist a qualified privilege." Gilbertson v. Jones, No. 316cv255, 2016 WL 6518659, at *3 (E.D. Va. Sept. 22, 2016). This privilege requires a court to balance a party's interest in obtaining the information at issue with society's interest in

ensuring the free flow of information through the press. LaRouche v. Nat'l Broad. Co., 780 F.2d 1134, 1139 (4th Cir. 1986).

The Fourth Circuit has adopted a three-part test to guide the balancing process, looking to: "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." LaRouche, 780 F.2d at 1139 (citation omitted). In addition, a court must consider that "[a] reporter holds a heightened interest in maintaining the confidences of her sources, but even revealing non-confidential materials burdens the press." Gilbertson, 2016 WL 6518659, at *3 (citing Stickels, 750 F. Supp. at 732). "Despite this burden, courts consider the reporter's interest diminished in the absence of both confidentiality and vexation." Id. (citing United States v. King, 194 F.R.D. 569, 582, 585 (E.D. Va. 2000)).

The Plaintiffs' subpoena does not implicate the confidentiality of the reporter's source because the source, Kamras, is revealed in the published article. Here, as discussed later, there is also no real burden placed on BH Media because BH Media need only produce a copy of the recorded interview. And, BH Media does not claim vexation.

The Plaintiffs assert that, under LaRouche, the recording is relevant to their liberty interest and defamation claims (Counts I and II). Pls.' Opp to Mot. to Quash 6, ECF No. 22. Application

of the LaRouche test is made, not in a vacuum, but in context of the claims asserted in the particular case. Therefore, it is necessary to outline the elements of both Counts I and II.

### A. The Liberty Interest Claim

The Plaintiffs' due process claims (Count I) arise from the two rights protected by the Fourteenth Amendment: "(1) the liberty to engage in any of the common occupations of life; and (2) the right to due process where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." Sciolino v. City of Newport News, 480 F.3d 642, 646 (4th Cir. 2007) (quotations and citations omitted). To state a liberty interest claim under the Due Process Clause, a plaintiff must allege that "the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Id.

The Plaintiffs liberty interest claims are based, in part, upon the allegedly false statements Kamras made about the Plaintiffs that caused "a stigma to [their] reputation." FAC ¶ 46, ECF No. 11. Specifically, Plaintiffs allege that the statements Kamras made to reporters "about Carver, the Report, cheating, and his plans for terminating the plaintiffs," (Pls.' Opp. to Mot. to Quash 5, ECF No. 22), form the basis of Plaintiffs' liberty interest claims. FAC ¶ 46, ECF No. 11 ("Kamras also

9

expressly endorsed the many false statements made about Alexis in the Report when he repeatedly embraced the Report in public . . . and touted the seeming veracity of the students' comments contained therein."). Therefore, it is appropriate to examine the statement that Kamras made to Mattingly to determine whether it plausibly can be said to have "placed a stigma on [Plaintiffs'] reputation." Sciolino, 480 F.3d at 646 (quotations and citations omitted).

### B. Defamation

In Virginia, a defamation claim requires (1) publication (2) of an actionable statement (3) with the requisite intent. Jafari v. Old Dominion Transit Mgmt. Co., 462 F. App'x 385, 390 (4th Cir. 2012); Jordan v. Kollman, 269 Va. 569, 575 (2005). Publication occurs when the communication of the statement is made to a third party. See Echtenkamp v. Loudon Cnty. Pub. Schs., 263 F. Supp. 2d 1043, 1061 (E.D. Va. 2003). To qualify as actionable, a statement must be both false and defamatory. Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993). A defamatory statement is one that "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." See, e.g., id. at 1092.

Whether a statement is actionable defamation is a threshold issue to be determined by the court as a matter of law. Chaves v. Johnson, 230 Va. 112, 119 (1985). The potentially defamatory statement must be construed as a whole and viewed in the context

the statement was made, considering the surrounding facts and circumstances. See Hyland v. Raytheon Technical Servs. Co., 277 Va. 40, 47 (2009); Richmond Newspapers, Inc. v. Lipscomb, 234 Va. 277, 297-98 (1987); Zayre of Va., Inc. v. Gowdy, 207 Va. 47 (1960); Alexandria Gazette Corp. v. West, 198 Va. 154 (1956). Further, the statement must "be considered in light of the plain and ordinary meaning of the words used in context as the community would naturally understand them." Wells v. Liddy, 186 F.3d 505, 523 (4th Cir. 1999). Virginia courts consider the statement within its context at the time of publication. See, e.g., Schaecher v. Bouffault, 290 Va. 83, 93-96 (2015). The allegedly defamatory statement must be viewed "in the context of all of the statements that he made to" Mattingly. Gilbertson, 2016 WL 6518659, at *5.

Against this background, it is appropriate to balance the parties' interests according to the LaRouche test.

### C. LaRouche Factors

#### 1. Relevance of the Recording

BH Media argues that the Plaintiffs' claims are based on Kamras' "public comments" so that any unpublished statement made by Kamras during the interview "is neither relevant nor material to the Plaintiff's claims." Memo. in Supp. Mot. to Quash 6, ECF No. 21. The Plaintiffs respond that the Newspaper has information pertinent to the litigation that is not protected by the First Amendment, stating that:

11

> Kamras is the lone individual defendant in this case and his words, by and large, form the basis for the plaintiffs' defamation and liberty interest claims. What he was saying – to reporters no less – about Carver, the Report, cheating, and/or his plans for terminating the plaintiffs or accepting their resignations is critical to the allegations in this case. Not only does the recording contain potential evidence of even more defamatory statements, it provides a contemporaneous look into the mindset of Kamras at the very time the events in this case were taking place.

Pls.' Opp. to Mot. to Quash 5, ECF No. 22.

Evidence is considered relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evience; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Thus, evidence that tends to make an element of the Plaintiffs' claim more likely than not is relevant under LaRouche.

What Kamras said to Mattingly during the interview is certainly proof of Kamras' state of mind, an element that lies at the core of the liability and damage issues of Plaintiffs' defamation claims. Additionally, as Plaintiffs assert, and given Kamaras' highly critical statement published in the Richmond-Times Dispatch article and elsewhere,[4] it is plausible to believe that Kamras published other defamatory statements to Mattingly during

---

[4] ECF No. 11-3. Specifically, the article attributed the following statement to Kamras: "'The actions were a betrayal of trust, so they can't work for RPS.'"

12

the course of his interview. And, of course, publication is an element of the Plaintiffs' defamation claim.

In addition, in support of their liberty interest claim, Plaintiffs state that

> false statements at issue were <u>made public</u> to, among others, local television stations, <u>local newspapers</u>, and those (e.g., parents, citizens, and students) who attended the August 1, 2018 meeting.

FAC ¶ 47, ECF No. 11 (emphasis added). Therefore, evidence of publication is also relevant to the Plaintiffs' liberty interest claim. Accordingly, evidence of the statements that were made in Kamras' interview with Mattingly "plays an important role" in litigation over claims of the type asserted in Counts I and II.

On the record, the Plaintiffs have satisfied the relevance facet of the <u>LaRouche</u> test.

### 2. Availability of the Information From Other Sources

First, BH Media argues that, to the extent any statement made during the Newspaper's recording is relevant, "the statement is accurately reflected in the news article published on August 7, 2018, a copy of which has been produced to Plaintiff." Memo. in Supp. Mot. to Quash 6, ECF No. 21. However, there is nothing in the record that shows that to be the case or from which the Court could reach such a conclusion.

Next, BH Media argues that the Plaintiff must "attempt to obtain information equivalent to the contents of the Newspaper's August 6 interview" from alternative sources, and that "Plaintiff cannot make this showing because [they have] not taken Superintendent Kamras' deposition, and nothing precludes [them] from doing so." Memo. in Supp. Mot. to Quash 6, ECF No. 21. In making this argument, BH Media cites to several cases. Reply to Pls.' Memo. in Opp. 3, ECF No. 24 ("See, e.g., LaRouche v. Nat'l Broad. Co., 780 F.2d 1134, 1139 (4th Cir. 1986) (district court properly denied motion to compel newsgathering materials where the requesting party "did not exhaust all his nonparty depositions before making the motion, and he failed to demonstrate to the court unsuccessful, independent attempts to gain the requested information."); cf. Tripp v. Dep't of Def., 284 F. Supp. 2d 50, 61 (D.D.C. 2003) ("Plaintiff has engaged in minimal discovery, choosing instead to directly seek [the reporter's] deposition . . . It is therefore clear that plaintiff has not exhausted all reasonable alternative sources of information regarding [the reporter's] sources, and cannot, at this stage in the litigation, overcome [the reporter's] assertion of 'reporter's privilege.'"). Based on these cases, BH Media phrases the issue as, not "whether Kamras can provide the recording itself, but whether [Kamras] can testify to the equivalent of the recording by describing what he discussed in the interview that captured on the

14

record." Id. at 4. But, even if Kamras could testify as to his recollection of the interview, that would not be equivalent to the recording of the interview itself. As the Gilbertson court stated, "Although the defendant's memory could provide an alternative source for the material, his testimony will surely face reliability and credibility attacks at trial." Gilbertson, 2016 WL 6518659, at *5.

And, it is beyond dispute that the Richmond-Times Dispatch "is the sole entity in possession of contemporaneous statements made by Kamras about Carver, the Report, and issues related thereto," (Pls.' Opp to Mot. to Quash 6, ECF No. 22), and the interview cannot be obtained from any other source. See Federico v. Lincoln Military Housing, LLC, No. 2:12-cv-80, 2014 WL 3962823, at *5 (E.D. Va. Aug. 13, 2014) (stating that "some of the information sought is such that it may only be obtained through" the newspaper). Because the Richmond-Times Dispatch is in sole possession of the recording, this factor weights in favor of disclosing the recording to the Plaintiffs.

### 3. Compelling Interest in the Information Sought

Lastly, LaRouche requires that the court determine whether the party seeking the information has a compelling interest in the information sought. The test for whether there is a compelling interest in disclosing a piece of evidence turns on whether the evidence "could play a role in the outcome in the proceedings."

15

Frederico v. Lincoln Military Hous., LLC, 2014 WL 3962823, at *6 (E.D. Va. Aug. 13, 2014). The Plaintiffs argue that the recording presents "critical evidence about the in-the-moment thoughts and statements that Kamras was making to the public" which invoke Kamras' state of mind. Pls.' Opp to Mot. to Quash 6-7, ECF No. 22. And, that is no doubt true. More importantly, the recording can provide proof of Kamras' state of mind and the reasoning for the quoted part of the interview. On this record, the Plaintiffs have shown a compelling interest in the information sought.

### D. Burden of Producing the Recording on the Newspaper

In addition to the LaRouche factors, the Court must consider the burden producing the information places on the Richmond-Times Dispatch. The Plaintiffs argue that the burden is merely administrative in nature. Pls.' Opp to Mot. to Quash 7, ECF No. 22. BH Media, on the other hand, argues that this is an oversimplification that "ignores the broader rationale underlying the qualified privilege," (Reply to Pls.' Memo. in Opp. 7, ECF No. 24), and that requiring BH Media to produce the recording "would change the function of a newspaper from that of a publisher to that of a testifier." Mackay v. Driscoll, 3 Med. L. Rptr. 2585, 2583 (Sup. Ct. N.Y. 1978).

While the Court acknowledges that requiring media organizations to produce copious amounts of information in response to every subpoena would be "potentially stifling,"

16

producing the single recording at issue can hardly be said to be a burdensome task. Nor has BH Media shown a burden in producing one recording. And, BH Media's policy argument would, if adopted, amount to a blanket rule that would be inconsistent with the correct application of LaRouche.

Finally, Mattingly and BH Media have a significantly diminished interest in the recording at issue because there is no need to protect Kamras as a confidential source and the subpoena "does not harass the reporter or enlist her as an investigative arm of the litigant. Rather, the subpoena seeks the entirety of what Kamras said. In other words, the subpoena also seeks to capture the 'outtakes of the interview, . . . Without any evidence of confidentiality of vexation, the Court finds that the interest in disclosure outweighs the Reporter's interest." Gilbertson, 2016 WL 6518659, at *5 (citing King, 194 F.R.D. at 585).

In sum, the burden placed on BH Media in producing the recording is minimal. Therefore, this factor weighs in favor of producing the recording at issue.

17

## CONCLUSION

For the foregoing reasons, and having balanced all the applicable factors, BH Media's MOTION TO QUASH SUBPEONA *DUCES TECUM* TO NEWS ORGANIZATION (ECF No. 20) will be denied.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 22, 2020

18