**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

BETTY ALEXIS, <u>et al.</u>,

    Plaintiffs,

v.                           Civil Action No. 3:19-cv-00543

JASON KAMRAS, <u>et al.</u>,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on Defendants' MOTION FOR SUMMARY JUDGMENT (ECF No. 33). For the reasons set forth below, the motion will be granted in part and denied in part.

**I.  BACKGROUND**

This case arises out of certain public statements made by Richmond Public School Superintendent Jason Kamras ("Kamras") in the wake of standardized testing "irregularities" at George Washington Carver Elementary ("Carver") in the spring of 2018.

Proceeding in federal court pursuant to 42 U.S.C. § 1983,[1] plaintiffs Betty Alexis, Chireda Cotman, and Stephanie Burgess[2]

---

[1]    Section 1983 confers no substantive rights. Rather, it provides a procedural vehicle for pursuing in federal court a claim for a violation of a federal constitutional or statutory right by one acting under color of state law. <u>Chapman v. Houston Welfare Rights Org.</u>, 441 U.S. 600, 615–18 (1979).

[2]    Former plaintiff Troy Johnson agreed to settle his case with Defendants. This Opinion will not discuss his claims.

allege in COUNT I that Kamras[3] violated their right, under the Fourteenth Amendment to the United States Constitution, to be free to engage in any of the common occupations of life and with respect to their good name, reputation, honor, and integrity.   FIRST AMENDED COMPLAINT ("FAC") ¶¶ 43-51, ECF No. 11; Cotman FAC ¶¶ 43-51, ECF No. 11 (3:19-cv-545); Burgess FAC ¶¶ 47-45, ECF No. 12 (3:19-cv-544).   In COUNT II, Plaintiffs allege that Kamras defamed them.[4]   FAC ¶¶ 52-59, ECF No. 11; Cotman FAC ¶¶ 52-59, ECF No. 11 (3:19-cv-545); Burgess FAC ¶¶ 46-53, ECF No. 12 (3:19-cv-544).   On June 12, 2020, Defendants filed a MOTION FOR SUMMARY JUDGMENT (ECF No. 33), which is the subject of this Opinion.

The parties have taken discovery.   The record on this Motion consists of news articles, emails, public documents, and deposition testimony.   There are many undisputed facts, but there are some areas of contention.   It is thus necessary to outline the general factual circumstances that gave rise to the case, and, in so doing, to accord Plaintiffs the benefit of all reasonable inferences.   Moreover, because of the nature of both claims, it is necessary to understand which of Kamras' public statements are at issue and the broader context in which they were made.

---

[3] Plaintiffs withdrew their identical claims against the RPS School Board at the summary judgment hearing on Tuesday, October 13, 2020.
[4] Plaintiffs withdrew their malicious prosecution claims in their summary judgment memorandum. See Pls. Mem. Opp'n Defs.' Mot. Summ. J. at 3 n.7, ECF No. 38.

## A.   The Investigation, Carver Report, and News Reports

The following facts are based on the summary judgment record and, where appropriate, the parties' prior filings.[5] Prior to the events that gave rise to this suit, Betty Alexis had been the Instruction and Compliance Coordinator at George Washington Carver Elementary ("Carver") since 2013.  Br. Supp. Mot. Summ. J. ¶ 2, ECF No. 34.   Stephanie Burgess had been a Title I math teacher since 2014.  Br. Supp. Mot. Summ. J. ¶ 3, ECF No. 34.  And Chireda Cotman had been a Title I reading teacher or "reading specialist," since 2011.  Br. Supp. Mot. Summ. J. ¶ 4, ECF No. 34.

Due to some accreditation problems in the Richmond Public School System (RPS), namely how few schools in the district were accredited, the Virginia Department of Education (VDOE) and the Richmond Public School Board entered into a Memorandum of Understanding (MOU) in 2017.  Br. Supp. Mot. Summ. J. ¶ 7, ECF No. 34.   "The MOU essentially requires RPS to obtain 'the state's approval for just about everything.' . . . The MOU is, in essence, state oversight over RPS and increases engagement between VDOE and RPS."  Br. Supp. Mot. Summ. J. ¶ 8, ECF No. 34 (citation omitted).[6]

_____

[5] Under Fed. R. Civ. P. 56(c)(3), a court can refer to other materials in the record (as opposed to only cited materials) when deciding a motion for summary judgment.
[6] Plaintiffs dispute a different portion of paragraph 8 in which they argue that Defendants were attempting to falsely state that the MOU created "a legal or moral obligation on RPS or Kamras to make public statements about the Carver report or any related

In May 2018, the SOL tests were administered to students at Carver.  FAC ¶ 2, ECF No. 11; accord Answer ¶ 2, ECF No. 13. During that testing period, Betty Alexis was a proctor.  FAC ¶ 12, ECF No. 11; Answer ¶ 12, ECF No. 13.  Chireda Cotman was a "floater" proctor.  Cotman FAC ¶ 12, ECF No. 11 (3:19-cv-545); Cotman Answer ¶ 12, ECF No. 13 (3:19-cv-545).  And Stephanie Burgess was not a teacher or examiner during the May 2018 testing, but she did proctor for a reading and science test.  Burgess FAC ¶ 10, ECF No. 12 (3:19-cv-544).[7]

In late May 2018, the Virginia Department of Education (VDOE) began an independent investigation into the Standards of Learning (SOL) testing results at Carver.  See Br. Supp. Mot. Summ. J. ¶ 11-14, ECF No. 34; Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 1-2, ECF No. 38.  As part of that investigation, on June 1, 2018, VDOE personnel began interviewing students, teachers, and administrators about the May 2018 testing at Carver, including Plaintiffs.  See Br. Supp. Mot. Summ. J. ¶¶ 14, 18, ECF No. 34. All student interviews were conducted by two adults: a VDOE employee and a School Board employee.  Br. Supp. Mot. Summ. J. ¶ 14, ECF No. 34.

_____

personnel recommendations."  Pls. Mem. Opp'n Defs.' Mot. Summ. J. at 21, ECF No. 38.
[7] Defendants deny that Burgess did not participate in SOL testing. Burgess Answer ¶ 10, ECF No. 14 (3:19-cv-544).

The parties dispute what the students actually said during these interviews,[8] but the VDOE report (the "Carver Report") summarizing the investigation would eventually quote the students as saying:

- "If I get stuck, I ask Ms. Alexis what does it mean. She gives me examples. Sometimes she helps me decide which paragraph to read. After I answered the question, she asked me, 'Did it say they did that?' She tells me to go back to check to see."

- "She [Ms. Alexis] gives hints. She says think again but can't give you the answer."

- "Ms. Cotman and Ms. Lacy were going around to check. They were checking work for everybody."

- "Ms. Cotman would check your work. If I got it right, she said go to the next one."

- "I was stuck on one, and Ms. Burgess showed me how to do it."

- "Mr. Johnson doesn't help. He tells me if it's right or wrong."

Br. Supp. Mot. Summ. J. ¶ 31, ECF No. 34. In the course of its investigation, VDOE not only conducted interviews but also "analyzed SOL test data, including response change data (answers changed from incorrect to correct or no answer to correct), longitudinal data of students' performance over time, and data regarding expedited retakes." Br. Supp. Mot. Summ. J ¶ 22, ECF No. 34.

---

[8]  See Pls. Mem. Opp'n Defs.' Mot. Summ. J. at 21, ECF No. 38; Reply Br. Supp. Mot. Summ. J. at 5, ECF No. 47. Neither party disputes what the Carver Report stated.

As a result of the information that the VDOE investigative team learned on June 1, 2018, the VDOE directed that all SOL tests taken up to that point should be invalidated. Br. Supp. Mot. Summ. J. ¶ 19, ECF No. 34.  Testing resumed on June 5, 2018, but this time, VDOE staff observed all SOL test administrations.  Br. Supp. Mot. Summ. J. ¶ 19, ECF No. 34.

On June 6, 2018, the Richmond Times Dispatch published an article titled "Questions remain unanswered about Richmond's Carver Elementary School 'potential irregularities' in SOL testing."  FAC ¶ 14, ECF No. 11; Ex. A, ECF No. 11-1; Answer ¶ 14, ECF No. 13.  The article stated that "the uncertainty" of how widespread and how far back the irregularities go "cast[s] a shadow over what has been seen as an underdog story . . . Carver, despite being home to a high-poverty student population, is the third-highest achieving elementary school in the city.  The school's test scores shot up in recent years."  Ex. A, ECF No. 11-1.  The article added that, as a result of testing irregularities, "questions linger about the validity of that achievement" and "[if] the state finds irregularities, the federal education department can rescind [Carver's] Blue Ribbon status."  Ex. A, ECF No. 11-1. The article also reported that Parent-Teacher Association president, Mariah White, stated that "no cheating had transpired." Ex. A, ECF No. 11-1.  Finally, a grandfather of two first-grade

Carver students was quoted as saying "I don't understand how adults can sit around and hurt these kids." Ex. A, ECF No. 11-1.

According to Defendants, "[o]n June 22, 2018, the VDOE gave a presentation to the RPS Leadership Team, including Kamras . . . . During this presentation, the VDOE shared the findings of its investigation with RPS, which included both data and information from the student and staff interviews . . . The VDOE also identified the staff members alleged to have provided inappropriate assistance." Br. Supp. Mot. Summ. J. ¶ 25,[9] ECF No. 34; accord Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 7, ECF No. 38. However, there is some dispute regarding exactly what the VDOE said during this meeting. See Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 8, ECF No. 38; Reply Br. Supp. Mot. Summ. J. ¶ 8, ECF No. 47.

On June 26, 2018, Alexis, Burgess, and Cotman were placed on administrative leave. Br. Supp. Mot. Summ. J. ¶ 27, ECF No. 34.

On Thursday, July 26, 2018, the VDOE told Kamras that the final draft of the Carver Report would be published on Monday, July 30, 2018, but while Kamras crafted his statement over the following weekend, he did not have any information beyond that which was provided in the June 22, 2018 meeting. Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶¶ 10, 28, ECF No. 38.

---

[9] Plaintiffs neither accepted nor disputed this paragraph. As Defendants note, Reply Br. Supp. Mot. Summ. J at 5, ECF No. 47, under Local Civil Rule 56(B), the Court is entitled to treat paragraph 25 as admitted. E.D. Va. Local R. 56(B).

In the course of drafting his eventual July 30, 2018 statement, Kamras emailed his staff to request feedback on his first draft, stating, "Be prepared: I decided to really lean into this." Ex. Q, ECF No. 39-17. Kamras received several comments on his drafts, including some from his chief of staff, Michelle Hudascko. See, e.g., Ex. U, ECF No. 39-21. For example, in response to the portion of Kamras' draft that said "[w]hat most disturbs me about what the adults named in this report did at Carver," Ex. T, ECF No. 39-20, Hudascko commented, "I am hesitant to have the 'adults named in this report' clause – would prefer for it just to be 'the report.'" Ex. U, ECF No. 39-21. Kamras took Hudascko's suggestion on the next draft. See Ex. V, ECF No. 39-22.

"On the morning of July 30, 2018, the VDOE ha[d] a webinar with Kamras and members of the Leadership Team to provide a briefing and overview of the final Carver Report and its various sections." Br. Supp. Mot. Summ. J. ¶ 28, ECF No. 34.

"At approximately 3:30 p.m. on July 30, 2018," Kamras received the final copy of the Carver Report from the VDOE. Br. Supp. Mot. Summ. J. ¶ 29, ECF No. 34.

At some point in the afternoon of July 30, 2018, the VDOE published a report titled "Report on George Washington Carver Elementary School, Richmond Public Schools, 2018 Standards of Learning Test Investigation, July 30, 2018" (the "Carver Report")

summarizing the findings of its independent investigation.   <u>See</u>
Br. Supp. Mot. Summ. J. ¶ 29-32, ECF No. 34.

The Carver Report identified a number of Carver employees by
name, including plaintiffs Betty Alexis, Stephanie Burgess, and
Chireda Cotman.   Br. Supp. Mot. Summ. J. ¶ 31, ECF No. 34.
Plaintiffs' names appeared in a section titled "Other Student
Statements" where the Carver Report quoted anonymous students who
reported that they had received "inappropriate assistance" from
examiners and proctors during SOL testing.   Br. Supp. Mot. Summ.
J. ¶ 31, ECF No. 34.   However, the Carver Report also indicated
that the student statements mentioning the Plaintiffs were not
able to be corroborated with testing data.   Br. Supp. Mot. Summ.
J. ¶ 31, ECF No. 34.

The Carver Report did not use the words "cheat," "cheating,"
or "cheated," with regard to the alleged testing irregularities.
Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 15, ECF No. 38.   In her
deposition, Dr. Sarah Susbury, the state's lead independent
investigator and the primary author of the Carver Report, stated
that the report did not reference "cheating" because "that's not
a term we use . . . I think cheating makes it sound like it is
intentional and there is maybe more read into that, so we stick
with the more neutral term . . . if assistance was provided, it
was either appropriate or inappropriate."   Pls. Mem. Opp'n Defs.'
Mot. Summ. J. ¶ 15, ECF No. 38.

The Carver Report also did not use the words "intentional" or "willful." Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 16, ECF No. 38. In her deposition, Dr. Susbury stated that "[t]hat's really not a determination we make, because we . . . don't know the individuals . . . we laid out what occurred, what we found, and then, from there, that determination [of intentionality] is left to the school division." Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 16, ECF No. 38. Similarly, the Carver Report "did not describe any of the alleged conduct as "orchestrated" or "coordinated." Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 16, ECF No. 38.

### 1. Kamras' July 30, 2018 Statements

At approximately 4:00 p.m. on July 30, 2018, Kamras spoke with reporters about the Carver Report. Br. Supp. Mot. Summ. J. ¶ 32, ECF No. 34. Kamras first read a statement which largely mirrored the statement that was later posted on the RPS website and emailed to members of the public.[10] In relevant part, Kamras stated:

> The report is deeply troubling. It presents abundant evidence of what amounts to cheating by a small group of adults on the SOL examinations for the past several years at Carver. To be clear: our students did nothing wrong; they merely followed the instructions of the adults responsible for them.

---

[10] In their Answer, Defendants pointed out that the written statement that was published online was not exactly what Kamras read to reporters on July 30, 2018. Answer ¶ 22, ECF No. 13. That is true, but the differences are trivial.

Cheating is unacceptable. Full stop. Above all else, my administration will be one of integrity – which, as one of my favorite elementary teachers so aptly put it, means doing the right thing even when no one is looking. We ask this of our students; the least we can do is model it ourselves.

To safeguard the integrity of our testing processes across the division, I have asked Dr. Tracy Epp, our Chief Academic Officer, to convene a working group of teachers and principals to provide recommendations about both policy and practice in time for the Spring 2019 SOL testing.

What most disturbs me about what occurred at Carver is that it effectively robbed our young people of the opportunity to demonstrate their learning free from suspicion. In doing so, it helped perpetuate pernicious stereotypes about what children from low-income families and children of color can achieve.

To be blunt: too many people thought, "How could Carver, which serves nearly 100% low-income students and students of color, have such high scores? There must be something going on." With those suspicions now confirmed, corrosive biases about our students, as well as the inequities that flow from them, have the potential to become even more ingrained in our city.

We can't let that happen.

To the entire City of Richmond, I want to say this as clearly as I possibly can: High achievement at every one of our high-poverty schools is unequivocally possible. I've seen it with my own students when I taught in a high-poverty neighborhood in Washington DC, and I've seen it in countless classrooms across the country – including Richmond.

At the same time, I am the first to admit that high-performing, high-poverty classrooms are the exception, not the rule, in RPS. We have a moral obligation to change that – and we will.

I'm under no illusion that doing so will be easy. It's going to require us to confront biases and stereotypes head-on; to provide more and better support to our

students and teachers alike; to be bold and
innovative; to fiercely advocate for more resources;
and to be unrelenting in the face of challenges ahead.

Every one of our students, from every single
neighborhood and every single family, has the capacity
for greatness. It is our collective responsibility to
create the conditions that will allow that greatness
to shine. And that is exactly what we will do.

FAC ¶ 21, ECF No. 11 (emphasis removed); Ex. B, ECF No. 11-
2.  Kamras' director of communications, Kenita Bowers, was not
involved in the drafting or reviewing of Kamras' July 30 statement
because Kamras "acted with such rapidity" in putting the statement
out the same day that the Carver Report was published.  Pls. Mem.
Opp'n Defs.' Mot. Summ. J. ¶ 38, ECF No. 38.

After reading the statement, Kamras answered several
questions from reporters.  Br. Supp. Mot. Summ. J. ¶ 32, ECF No.
34.  First, in response to a question about "whether he believed
the 'cheating' was done 'intentionally' or was the product of
'mistakes' or not following protocol," Kamras stated "[b]ased on
the evidence in the report, I don't see any other conclusion than
it was intentional."  FAC ¶ 22, ECF No. 11; accord Answer ¶ 22,
ECF No. 13.  Second, in response to a question about what would
happen to the small group of adults involved, Kamras stated, "I
can't comment on personnel matters."  Answer ¶ 22, ECF No. 13.
Third, in response to a question about how many individuals were
involved, Kamras said, "I would refer you to the report on that.
It lists the individuals who were involved."  Answer ¶ 22, ECF No.

13; accord FAC ¶ 22, ECF No. 11.   Fourth, in response to a question about who Kamras blamed for the fact that Carver would likely not be accredited in the upcoming year, Kamras said, "I blame the individuals who misguided our students."   FAC ¶ 22, ECF No. 11; Answer ¶ 22, ECF No. 13.

On July 31, 2018, in internal emails, members of Kamras' staff began pursuing "written reprimand[s]" for Chireda Cotman, Stephanie Burgess, and Troy Johnson, but stopped because, according to the emails, Kamras "want[ed] to press pause on the letters of reprimand" because "[h]e may want to do more."  Ex. PP, ECF No. 39-43.

### 2. Kamras' August 1, 2018 Statements

A public meeting at Carver was scheduled for August 1, 2018 to discuss the Carver Report.   FAC ¶ 24, ECF No. 11; Answer ¶ 24, ECF No. 13.   Before the meeting, Kamras spoke to reporters, FAC ¶ 24, ECF No. 11; Answer ¶ 24, ECF No. 13, and stated:

> I want to reiterate that what happened at Carver is unconscionable. The adults who orchestrated this systemic cheating violated a sacred trust with our students and our families. Though I can't comment on specific personnel actions, I want to assure the public that the individuals involved will be held accountable. To be direct: pending Board approval, I can confirm that no one who participated in the cheating scandal will be employed by RPS when the new school year begins. Moreover, pending State approval, I can confirm that none of these individuals will hold a teaching or administrative license in the Commonwealth.

Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 43, ECF No. 38 (emphasis omitted).  Kamras authored that statement, and he did not seek any input from his director of communications, Kenita Bowers.  Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 44, ECF No. 38.

Kamras then spoke about the Carver Report at the public meeting.  There, Kamras stated, "The adults who orchestrated this cheating violated a sacred trust," and he added that the persons involved in the scandal would be terminated, and RPS would seek to revoke their teaching licenses.  Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 46, ECF No. 38.

Following the public meeting, the Richmond Times Dispatch published an article on August 1, 2018 titled "UPDATED: Richmond Public Schools recommends ousting 10 members of Carver cheating ring, license revocation."  Ex. C, ECF No. 11-3.  In the article, Kamras is quoted as saying "[t]he public needs to know that there are consequences to these actions."  Ex. AA, ECF No. 39-27.

Meanwhile, also on August 1, 2018, Kenita Bowers, Kamras' Director of Communications, responded to written press inquiries regarding the employment of the individuals mentioned in the report.  Ex. CC, ECF No. 39-29.  In response to the question "Do the teachers named in the report remained [sic] employed by RPS?", Bowers said:

> There is no change in the employment status of any of the individuals named in the investigation at this time . . . Depending upon the type of action taken,

> the timeline for this process can take up to a minimum
> of 10 days and requires school board approval for the
> final outcome. It is our practice not to comment on
> personnel matters while this is underway due to legal
> obligations and to protect the overall integrity of
> the process. That said, it would be most helpful for
> the media to assist us in conveying this information
> to the public versus feeding the narrative that no
> action is being taken at all.

Ex. CC, ECF No. 39-29.   And in response to questions
regarding whether RPS would try to remove those involved in
the cheating, Bowers is quoted as saying:

> The individuals involved in the investigation also
> have legal rights, and it is our practice to err on
> the side of caution to ensure that the school division
> is not held liable for divulging any compromising
> information while the personnel action process is
> underway.

Ex. AA, ECF No. 39-27.   In the same article, Bowers is also
quoted as saying:

> This is still considered to be a personnel matter, and
> there is a level of confidentiality that must be upheld
> with respect to the fidelity of the overall process.

Ex. AA, ECF No. 39-27.

On August 6, 2018, Burgess, Cotman, and Alexis were informed
that Kamras was recommending that their employment with the School
Board be terminated.   Br. Supp. Mot. Summ. J. ¶¶ 37, 46, 49, ECF
No. 34.

On August 7, 2018, the Richmond Times Dispatch published an
article written by Justin Mattingly titled "Carver principal and
5 others resign from Richmond Public Schools after test cheating

investigation." Ex. D, ECF No. 11-4. The article lists the names of all six employees who resigned: "[i]n addition to Yates, the five others to resign were teachers Evette Cartwright, Kayiesha Golds, Chireda Cotman and Betty Alexis, and former Assistant Principal Fay Joyner." Ex. D, ECF No. 11-4. Kamras was quoted in the article as saying "[t]he actions were a betrayal of trust, so they can't work for RPS." Ex. D, ECF No. 11-4. And Scott Barlow, "who represents the school," was quoted as saying (1) "RPS is already taking disciplinary actions against those involved in the cheating at Carver very seriously by pursing their teaching licenses"; (2) "[t]he process to remove these bad actors should not be prolonged for symbolic purposes. The Carver community deserves the right to heal and move forward"; and (3) "we're taking action to ensure that they can't teach in the entire commonwealth, not just RPS." Ex. D, ECF No. 11-4.

On August 8, 2018, the VDOE issued an addendum to the Carver Report that specifically addressed the "Other Student Statements" section on page 11 of the Carver Report. The purpose of the addendum was to clarify that the student who stated "I was stuck on one, and Ms. Burgess showed me how to do it" was actually referring to the 2017 administration of the SOL tests, not the 2018 administration. Br. Supp. Mot. Summ. J. ¶ 34, ECF No. 34.

On August 9, 2018, the Richmond Free Press published an article called "Out: Richmond School Board accepts resignations."

Ex. LL, ECF No. 39-32.  The article states that following a closed session on Monday night [i.e., August 6, 2018], the School Board voted to accept the resignations of Kiwana Yates, Fay Joyner, Evette Cartwright, Kayiesha Golds, Chireda Cotman, and Betty Alexis.  The article adds that, "in an email Wednesday [i.e., August 8, 2018] to the Free Press when asked why those involved weren't fired," Kamras responded, "We allowed them to resign to avoid protracted legal battles which would have cost the school system a great deal of time and money."  Ex. LL, ECF No. 39-32. Kamras was also quoted as saying, "If you cheat, you can't work at RPS."  Ex. LL, ECF No. 39-32.

Finally, on September 20, 2018, after the VDOE voted to withhold Carver's accreditation, Kamras made a public statement in which he said:

> Every one of our students has the capacity for greatness. As I have shared previously, what most disturbs me about what occurred at Carver is that adults robbed our children of the opportunity to demonstrate their abilities without suspicion. And there are consequences for that, including the withholding of accreditation, which I fully support.

Ex. GG, ECF No. 39-33.

## B.   Personnel Decisions

### 1.   Alexis

Alexis was placed on administrative leave on June 26, 2018. Br. Supp. Mot. Summ. J. ¶ 27, ECF No. 34.  At some point on July 30, 2018, Alexis resigned.  Br. Supp. Mot. Summ. J. ¶ 36, ECF No.

34.   Alexis was out of the country and on administrative leave at the time.   Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 66, ECF No. 38.

She had seen a news report on July 30, 2018 "about the school scandal."   Ex. QQ, ECF No. 39-44.   However, Alexis had not read the Carver Report or "had any contact with any RPS employee, including Human Resources" before she resigned.   Br. Supp. Mot. Summ. J. ¶ 36, ECF No. 34.

Moreover, "[n]o one from RPS told Alexis to resign and no one from RPS told her that she would be terminated if she did not resign."   Br. Supp. Mot. Summ. J. ¶ 36, ECF No. 34.   The School Board later voted to accept Alexis' resignation.   Answer ¶ 38, ECF No. 13; accord FAC ¶ 38, ECF No. 11.

On August 6, 2018, Alexis was notified that Kamras was petitioning to revoke her teaching license.   Br. Supp. Mot. Summ. J. ¶ 49, ECF No. 34.   Alexis contested Kamras' petition, and she participated in a hearing before the School Board on December 3, 2018.   Br. Supp. Mot. Summ. J. ¶ 49, ECF No. 34.   At the hearing, she was able to tell the School Board her side of the story.   Br. Supp. Mot. Summ. J. ¶ 49, ECF No. 34.   The School Board, nevertheless, still recommended to the Virginia Superintendent of Public Instruction that Alexis' teaching license be revoked.   Br. Supp. Mot. Summ. J. ¶ 49, ECF No. 34.

Alexis appealed and testified at a hearing before the State Superintendent's Investigative Panel on March 22, 2019.   Br. Supp.

Mot. Summ. J. ¶ 50, ECF No. 34.   That panel recommended that Alexis' license not be revoked. Br. Supp. Mot. Summ. J. ¶ 50, ECF No. 34.

Alexis then participated in a hearing before the Virginia Board of Education on April 23, 2019.   Br. Supp. Mot. Summ. J. ¶ 50, ECF No. 34.   The Board of Education subsequently decided not to revoke Alexis' teaching license.   Br. Supp. Mot. Summ. J. ¶ 50, ECF No. 34.

Alexis has reported that she had difficulty finding work after "the cheating scandal began to erupt."   Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 65, ECF No. 38.

### 2.   Cotman

Cotman was placed on administrative leave on June 26, 2018. Br. Supp. Mot. Summ. J. ¶ 27, ECF No. 34.   Cotman resigned on July 25, 2018, well before the Carver Report was published.   Br. Supp. Mot. Summ. J. ¶ 35, ECF No. 34.   The School Board later voted to accept Cotman's resignation. Cotman Answer ¶ 35, ECF No. 13 (3:19-cv-545); accord Cotman FAC ¶ 35, ECF No. 11 (3:19-cv-545).

On August 6, 2018, Cotman was notified that Kamras was petitioning to revoke her teaching license.   Br. Supp. Mot. Summ. J. ¶ 46, ECF No 34.   Cotman contested the petition for the revocation of her teaching license.   Br. Supp. Mot. Summ. J. ¶ 46, ECF No 34.   At the licensure revocation hearing before the School Board on December 3, 2018, Cotman was able to tell her side of the

story.  Br. Supp. Mot. Summ. J. ¶ 46, ECF No 34.  After the hearing,
the School Board recommended that Cotman's license be revoked.
Br. Supp. Mot. Summ. J. ¶ 46, ECF No 34.

Cotman appealed and testified at a hearing before the State
Superintendent's Investigative Panel on March 22, 2019.  Br. Supp.
Mot. Summ. J. ¶ 47, ECF No. 34.   That panel recommended that
Cotman's license not be revoked.  Br. Supp. Mot. Summ. J. ¶ 47,
ECF No. 34.

On April 23, 2019, Cotman participated in a hearing before
the Board of Education.  Br. Supp. Mot. Summ. J. ¶ 48, ECF No. 34.
The Board of Education subsequently decided not to revoke Cotman's
teaching license.  Br. Supp. Mot. Summ. J. ¶ 48, ECF No. 34.

**3.   Burgess**

Burgess was placed on administrative leave on June 26, 2018.
Br. Supp. Mot. Summ. J. ¶ 27, ECF No. 34.   On August 6, 2018,
Burgess was informed that Kamras was recommending that her
employment with the School Board be terminated.  Br. Supp. Mot.
Summ. J. ¶ 37, ECF No. 34.   Burgess appealed that termination
recommendation, as did former plaintiff Troy Johnson.  Br. Supp.
Mot. Summ. J. ¶ 39, ECF No. 34.

Burgess was placed on administrative leave when the fall 2018
school year began.  Burgess FAC ¶ 31, ECF No. 12 (3:19-cv-544);
Burgess Answer ¶ 31, ECF No. 14 (3:19-cv-544).  While Burgess was
still on administrative leave, Troy Johnson successfully appealed

Kamras' termination recommendation after a hearing on September 28, 2018. Br. Supp. Mot. Summ. J. ¶ 40, ECF No. 34. After that, Kamras withdrew his termination recommendation for Burgess as well as his petition to revoke her teaching license. Br. Supp. Mot. Summ. J. ¶ 44, ECF No. 34. Burgess was then reassigned to teach at G.H. Reid Elementary School as a second-grade general education teacher. Br. Supp. Mot. Summ. J. ¶ 45, ECF No. 34.

Before the events giving rise to this case, Burgess was a Title I teacher. Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 67, ECF No. 38. Her job involved working with students who did not pass the SOL in previous years and giving them extra help. Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 67, ECF No. 38. She would give those students weekly assignments and pull them out of class to work with them on certain skills and strategies. Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 67, ECF No. 38. She would also review testing data and talk with teachers about things they needed to improve on. Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 67, ECF No. 38.

At her deposition, Burgess stated that "in Richmond the natural progression for assistant principal is Title 1." Ex. II 94:19-21, ECF No. 39-5. Moreover, Burgess attended Virginia Tech to obtain a master's in education and administration and leadership. Reply Br. Supp. Mot. Summ. J. ¶ 69, ECF No. 47.

Defendants deny that Burgess was demoted. Br. Supp. Mot. Summ. J. at 5, ECF No. 34. In making that point, Defendants note,

that before the events giving rise to this case, Burgess was a contract teacher with RPS, and her contract did not specify that she was a Title I teacher. Reply Br. Supp. Mot. Summ. J. ¶ 67, ECF No. 47.  It is undisputed that Burgess' salary and benefits did not change as a result of her transfer.  Br. Supp. Mot. Summ. J. at 15, ECF No. 34.

Burgess also stated that her transfer back to being a general education teacher was made worse because a letter of warning was placed in her personnel file which made it difficult for her to apply for new positions.  Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 70, ECF No. 38.  Defendants deny that Burgess actually received a written warning in her personnel file.  Reply Br. Supp. Mot. Summ. J. ¶ 70, ECF No. 47.

**C.   Kamras' Statements**

Two sets of statements by Jason Kamras are alleged to be defamatory: his July 30, 2018 statements and his August 1, 2018 statements.[11]   See FAC ¶¶ 45, 53; accord Ex. 52, ECF No. 34-53 ("Listing of Allegedly Defamatory Statements").  These statements are listed and discussed in detail in Part III.B.  For now, it suffices to note that the July 30, 2018 statements consist of (1) the statement that Kamras read to reporters and (2) his answers to

---

[11]  Because Plaintiffs never amended their FACs to include statements made after August 1, 2018, those statements will not be considered as part of the current summary judgment record.

reporters' questions during the subsequent press conference.  See FAC ¶¶ 45, 53.  The August 1, 2018 statements consist of (1) the statement that Kamras read to the reporters before the public meeting, (2) his statements during the public meeting, and (3) his statement to the Richmond Times Dispatch after the meeting.  See FAC ¶¶ 45, 53.

**D.    Paragraph 26**

In Defendants' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (ECF No. 34), they state:

> 26. At no time did anyone from the VDOE give RPS a reason to doubt the student statements. (Susbury dep. 283:10-19.) In fact, when RPS asked whether the students were credible, VDOE employees responded that they believed what the students said during the interviews. (Susbury dep. 216:4-13, 282:22-284:2; Meeks dep. 114:7-10; Cook dep. 44:18-45:11; 47:3-14; Epps dep. 83:15-84:19.)

Br. Supp. Mot. Summ. J. ¶, ECF No. 34.  If someone at RPS asked whether the students quoted in the report were credible, and if VDOE employees responded affirmatively, that fact could significantly affect arguments about Kamras' mental state during this period.

Plaintiffs object to paragraph 26 on the grounds that: (1) the students were misquoted in the Carver Report; (2) the conduct the students described did not occur; and (3) the student statements are hearsay.  However, Plaintiffs offered no evidence in support of their first two assertions, and moreover, the

statements in paragraph 26 do not amount to hearsay.  Paragraph 26 is not about the truth of what the students said; rather, it provides evidence that someone from RPS asked whether the students quoted in the Carver Report were credible and received an affirmative answer.

Under Local Civil Rule 56(B), the Court is entitled to treat paragraph 26 as if it were admitted; however, viewing the evidence in the light most favorable to the non-moving party, i.e., the Plaintiffs, the deposition transcripts that Defendants are citing in paragraph 26 do not seem to support Defendants' claim. Defendants cite "(Susbery dep. 216:4-13, 282:22-284:2; Meeks dep. 114:7-10; Cook dep. 44:18-45:11, 47:3-4; Epps [sic] dep. 83:15-84-19 [sic].)" for the proposition that "when RPS asked whether the students were credible, VDOE employees responded that they believed what the students said during the interviews."  The excerpts from the depositions of Donna Meeks and Holli Cook do not support that proposition.  See Ex. 19, ECF No. 34-20 (stating that Meeks, a VDOE employee, believed the students she interviewed); Ex. 15, ECF No. 34-16 (stating that Cook, a VDOE employee, asked a teacher if Cook should believe the students).  Similarly, pages 83 and 84 of the Tracy Epp deposition do not even address Defendants' claim.  See Ex. 10, ECF No. 47-11.  Thus, the deposition of Sarah Susbury is the only deposition that might support Defendants' claim.  See Ex. 12, ECF No. 34-13.  However,

the portion that the Defendants' cite (i.e., excerpt "216:4-13"), says only that during the presentation, Susbury "would have said that we didn't have any reason to disbelieve the students." See Ex. 12, ECF No. 34-13. It is not clear if she did say that or if anyone from RPS asked her whether they should believe the students. Nevertheless, excerpt "282:22-284:2" refers back to a prior answer that Susbury gave wherein she allegedly testified that someone from RPS asked her about the credibility of the students, and she said that she believed them. See Ex. 12, ECF No. 34-13. That earlier portion of the transcript was either not provided to the Court or it appears to incorrectly characterize Susbury's prior testimony in excerpt "216:4-13." See Ex. 12, ECF No. 34-13. At this time, the Court will not treat paragraph 26 as admitted.

Defendants' summary judgment motion must be decided in perspective of this record.

## II.   SUMMARY JUDGMENT STANDARD

A district court should grant a party's motion for summary judgment where the moving party demonstrates that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict for the non-moving party. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). A fact is "material" if, based on the governing law, it could affect the outcome of the suit. Id.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation marks omitted).

To successfully oppose a motion for summary judgment, the nonmoving party must show that there are specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, "[c]onclusory or speculative allegations do not suffice to oppose a properly supported motion for summary judgment, nor does a mere scintilla of evidence." Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)) (internal quotation marks omitted). Consequently, summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

When evaluating a motion for summary judgment, the district court should view the evidence in the light most favorable to the non-moving party. Jacobs, 780 F.3d at 568. That includes drawing all inferences in favor of the non-moving party. Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1004 (4th Cir. 1987).

Nevertheless, the court cannot weigh the evidence or make credibility determinations. Jacobs, 780 F.3d at 569. "'Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.'" Id. at 568 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedures § 2728 (3d ed. 1998)).

Finally, summary judgment is rarely appropriate where a party's mental state is a central element of a claim or defense. Ballinger, 815 F.2d at 1005.

## III. DISCUSSION

### A.   COUNT I: Plaintiffs' Liberty Interest Claims

The Fourteenth Amendment protects two distinct liberty interests: (1) the right to due process where "'a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him.'" and (2) the liberty to "'engage in any of the common occupations of life'" Sciolino v. City of Newport News, 480 F.3d 642, 646 (4th Cir. 2007) (citations omitted). These two interests can be violated by a public announcement of the reasons that a public employee was terminated or demoted, see id., without due process of law. Harrell v. City of Gastonia, 392 F. App'x 197, 202-03 (4th Cir. 2010).

To succeed on a § 1983 claim for a violation of these liberty interests under the Fourteenth Amendment Due Process Clause, a plaintiff must demonstrate by a preponderance of the evidence that

the "charges against him: [a] placed a stigma on his reputation; [b] were made public by the [public] employer; [c] were made in conjunction with his termination or demotion; and [d] were false." Sciolino, 480 F.3d at 646 (citations omitted).

Here, Kamras was clearly making statements publicly. And, for the purposes of his motion for summary judgment, Kamras has not advanced any arguments denying that his statements caused stigmatic harm or defending the veracity of his statements. Thus, the only question at this stage is whether the statements were made in conjunction with a termination or demotion.

For Alexis and Cotman, the Court finds that both plaintiffs voluntarily resigned, and therefore, their Fourteenth Amendment claims fail. For Burgess, the Court finds that a reasonable jury could find that Burgess was demoted, and therefore, her Fourteenth Amendment claim may proceed to trial.

### 1.   Alexis and Cotman

#### a.   "Forced Resignation" Theory

Alexis' liberty interest claim based on her allegedly forced resignation fails as a matter of law. A plaintiff can only recover for a violation of a protected liberty interest if the plaintiff was deprived of the interest because of a state action. Stone v. University of Maryland Medical System Stone Corp., 855 F.2d 167, 172 (4th Cir. 1988). "If he resigned of his own free will even though prompted to do so by events set in motion by his employer,

he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause." Id. at 173.  For example, in Stone v University of Maryland Medical System Corp., the fact that the representatives of a public employer specifically told a public employee to resign or they would initiate termination proceedings and have his clinical privileges revoked was not enough to render the employee's subsequent resignation involuntary.  Id. at 170-73.

A resignation is only involuntary if it amounts to a "constructive discharge." Id. at 173.  Courts have found an employee's resignation involuntary where (1) the employer engaged in deception or made misrepresentations about a material fact concerning the resignation or (2) the employer engaged in duress or coercion.  Id. at 174; see also Schultz v. United States Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987) (finding coercion, in a slightly different legal context, where an employee had a medical condition that left her unable to work and was given the choice to resign or face a charge for having been AWOL).

There is no allegation in this case that Alexis was lied to, so she must proceed on a theory of coercion.  Under the coercion theory, a resignation may be involuntary if, based on the totality of the circumstances, the employer "effectively deprived the employee of free choice in the matter." Stone, 855 F.2d at 174.

Alexis simply has not put forth credible claims that she was constructively terminated merely because she resigned to avoid being fired.  Alexis does not claim that RPS actually gave her the choice to resign or be fired.  Nor does she claim that anyone at RPS was even in contact with her at the time that she resigned. Moreover, even if Alexis could show that RPS had been in contact and given her that choice, that evidence, absent more, would still not be sufficient to show that she was constructively discharged. See Stone, 855 F.2d at 170-73.

### b.   "Vilification" Theory

Alexis and Cotman also claim that their liberty interests were threatened when Kamras "vilified" them as they were resigning, see Pls. Mem. Opp'n Defs.' Mot. Summ. J. at 26, ECF No. 38.  That claim also fails as matter of law.  In Siegert v. Gilley, the Supreme Court held that alleged defamation by a public employer following a public employee's voluntary resignation is not sufficient to make out a claim for deprivation of a liberty interest.  500 U.S. 226, 234 (1991).

In support of their "vilification" argument, Plaintiffs cite the unpublished, out-of-circuit case, Alexander v. Hargrove, No. CIV. 93-5510, 1995 WL 144636 (E.D. Pa. Mar. 31, 1995), which purports to distinguish the facts of its case from those in Siegert because, in Hargrove, the alleged defamation was made "incident" (i.e., shortly before) the "forced" resignation.  Id. at *6.  The

30

Court finds that Siegert is most analogous to the facts at hand and declines to follow Alexander v. Hargrove, which appears to be in tension with the Supreme Court's decision in Siegert. Given that no RPS employee threatened to terminate either Alexis or Cotman before both women resigned, Alexis and Cotman's resignations were arguably even more "voluntary" than those in Siegert. Thus, Alexis and Cotman's alternative "vilification" theory also fails as a matter of law.

Because the Court does not find that Alexis and Cotman were constructively discharged, there is no need to address their Due Process name-clearing argument.

### 2. Burgess

In the Fourth Circuit, the bar for proving that a "transfer" amounts to a "demotion" is quite high. See Ripath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 309 (4th Cir. 2006). A plaintiff must show that the "transfer" amounts to a "significant demotion," which essentially means that the plaintiff must have been reassigned to a position outside of his or her field. Id.

For example, in Hall v. City of Newport News, the Fourth Circuit found that a police officer was demoted outside of his chosen career where the officer was assigned "to a civilian position in the Records Bureau and stripped . . . of his law enforcement powers and status as a police officer." 469 Fed. Appx. 259, 261, 262-63 (4th Cir. 2012). And in Ripath v. Bd. of Governors

Marshall Univ., the Fourth Circuit held that an employee was demoted where the employee was transferred "outside the Department of Athletics, from Compliance Director to Director of Judicial Programs," a position for which he had no education or training. 447 F.3d at 310-12. In contrast, in Huang v. Board of Governors of North Carolina, the Fourth Circuit held that an intra-departmental transfer of a professor, where there was no loss of rank or pay, does not amount to a demotion sufficient to support a Fourteenth Amendment claim. 902 F.2d 1134, 1142 (4th Cir. 1990). Similarly, in Cominelli v. Rector & Visitors of the Univ. of Va., the district court held that a university employee who was removed from his position as the Chief of the Division of Gastroenterology and Hepatology and the Director of Digestive Health and Excellence but who kept his position as a university faculty member, was not demoted. 589 F. Supp. 2d 706, 710-14 (W.D. Va. 2008).

The Fifth Circuit, in a decision the Fourth Circuit has considered persuasive on this question, noted that if a police officer had been transferred from "corporal's duties" — which included the responsibilities of a patrolman and additional supervision and training responsibilities — to "janitorial duties," that might implicate a Fourteenth Amendment liberty interest but moving from the rank of corporal to patrolman did not. Moore v. Otero, 557 F.2d 435, 438 n.11 (5th Cir. 1977); see

also Ripath, 447 F.3d at 309 (discussing, with approval, the Fifth Circuit's decision in Moore).

At bottom, those in- and out-of-circuit cases teach that, even within the same field or employer, a transfer that results in the loss of the employee's rank or base duties, can amount to a "significant demotion" for Fourteenth Amendment purposes.

Here, based on the current summary judgment record, the Court finds that a reasonable jury could conclude that Burgess was demoted. It is clear that Burgess' transfer from being a Title I teacher to a general education teacher was not as stark as the transfer in Hall v. City of Newport News. See 469 Fed. Appx. 259, 261, 262-63 (4th Cir. 2012). However, it is not clear that her transfer was analogous to those in Huang v. Board of Governors of North Carolina and Cominelli v. Rector & Visitors of the Univ. of Va. See Huang, 902 F.2d at 1142; Cominelli, 589 F. Supp. 2d at 710-714. Burgess has put forth (contested) evidence, see Ex. II at 17:8-18:22, 72:20-73:10, ECF No. 39-35, that her transfer was indeed a drop in rank, contra Huang, 902 F.2d at 1142, and unlike the plaintiff in Cominelli, Burgess did not "maintain" a base level of responsibility between her two positions. See Cominelli, 589 F. Supp. 2d at 711; see also Moore, 557 F.2d at 438 n.11. According to Burgess, her job responsibilities changed completely. Compare Ex. II at 17:8-18:22, ECF No. 39-35 with Ex. II at 72:20-73:10, ECF No. 39-35; see also Ex. MM ¶ 5, ECF No. 39-40. Kamras: (1)

33

contests that Burgess was demoted (and provides evidence suggesting that she was not), Reply Br. Supp. Mot. Summ. J. ¶ 67, ECF No. 47, and (2) argues that Burgess' evidence of a demotion is merely "self-serving opinion." Reply Br. Supp. Mot. Summ. J. ¶ 69, ECF No. 47. Contrary to Kamras' arguments, the Court finds that Burgess' evidence is not merely "self-serving opinion" but rather sworn testimony describing specific, verifiable facts regarding her job duties, which if true, bolster her argument that she was demoted.

Therefore, based on the current record, whether Burgess was demoted involves a genuine dispute of material fact. Accordingly, Burgess' liberty interest claim must proceed to trial, so that a jury can resolve that dispute.

## B.   COUNT II: Defamation

The gravamen of Plaintiffs' defamation claims are that Kamras made several public statements of fact, not opinion, that falsely blamed Plaintiffs for the alleged cheating scandal at Carver. See, e.g., FAC ¶ 54. Specifically, Plaintiffs claim that Kamras falsely stated that Plaintiffs "(i) had orchestrated systemic cheating at Carver, (ii) had intentionally cheated, (iii) had caused a 'cloud' and stain on Carver, and (iv) had been responsible for the loss of academic integrity at Carver." FAC ¶ 54; Cotman FAC ¶ 53 (3:19-cv-545); Burgess FAC ¶ 48 (3:19-cv-544).

Kamras' motion for summary judgment argues that (1) the statements Kamras made were his opinion, not facts, and even if the statements had been facts, Kamras is entitled to (2) a common law qualified privilege and (3) statutory immunity which, according to Kamras, would bar Plaintiffs' ability to recover under Count II. See Br. Supp. Mot. Summ. J. at 19-23, 24-27, ECF No. 34. For the reasons that follow, the Court finds: (1) that, as a matter of law, six of the alleged defamatory statements made by Kamras are unactionable opinion; (2) that, as a matter of law, the common law qualified privilege is not applicable in this context; and (3) that the question of whether Plaintiffs can overcome Kamras' assertion of statutory immunity must go to a jury.

### 1.  Fact v. Opinion

The Court finds that five of Kamras' statements are "factual" or actionable opinion as a matter of law. Nevertheless, the six unactionable opinions are still relevant to the question of Kamras' mental state.

Whether a statement is "reasonably capable of defamatory meaning is a 'threshold matter of law' for the trial court." Morrisey v. WTVR, LLC, 432 F. Supp. 3d 617, 622 (E.D. Va. 2020) (quoting Va. Citizens Def. League v. Couric, 910 F.3d 780, 783 (4th Cir. 2018)). To make out a prima facie case of defamation, a plaintiff must demonstrate that there was "(1) publication (2) of an actionable statement with (3) the requisite intent." Steele

35

v. Goodman, 382 F. Supp. 3d 403, 418-19 (quoting Jordan v. Kollman, 612 S.E.2d 203, 206 (Va. 2005)).  A statement is published if it is heard and understood by a third person.  Thalhimer Bros., Inc. v. Shaw, 159 S.E. 87, 90 (Va. 1931).  An actionable statement is one that is false and defamatory.  Morrisey, 432 F. Supp. 3d at 622.  Defamatory words are those that "have the requisite defamatory 'sting' to one's reputation."  Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015).

Statements of opinion are, generally speaking, not actionable statements.  Hyland v. Raytheon Tech Servs. Co., 670 S.E.2d 746, 750 (Va. 2009).  However, "[a]n unsupported opinion that implies defamatory facts, like 'in my opinion Jones is a liar,' can cause as much damage to reputation and may be just as actionable as the statement, 'Jones is a liar.'"  Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 183 (4th Cir. 1998) (internal quotation marks omitted).  "When a statement is relative in nature and depends largely on a speaker's viewpoint, that statement is an expression of opinion" and not actionable.  Hyland, 670 S.E.2d at 751.

In contrast, an opinion can "constitute actionable defamation . . . if the opinion can be reasonably interpreted to declare or imply untrue facts."  Biospherics, 155 F.3d at 184.  Specifically, an opinion can constitute actionable defamation if a reasonable listener would interpret the speaker to be basing his or her opinion "on knowledge of facts of the sort that can be evaluated

in a defamation suit." <u>Steele</u>, 382 F. Supp. 3d at 419-20 (quoting <u>Baylor v. Comprehensive Pain Mgmt. Centers, Inc.</u>, No. 7:09-CV-00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011)). "Defendants can [also] be held liable for defamation 'when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader.'" <u>Baylor v. Comprehensive Pain Mgmt. Centers, Inc.</u>, No. 7:09-CV-00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011) (quoting Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 4:3.2 (4th ed. 2010)).  For example, employees of a doctor's former office telling patients that the doctor is no longer with the practice because the doctor's "'integrity was not high'" and that the doctor was terminated for "'ethical reasons'" could be actionable defamation.  <u>Baylor v. Comprehensive Pain Mgmt. Centers, Inc.</u>, No. 7:09-CV-00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011).

Whether a given statement is a fact or an opinion is a matter of law that must be decided by the trial judge before the claim can be submitted to a jury.  <u>Hyland</u>, 670 S.E.2d at 750.  When making this determination, the court may not isolate one portion of a statement; rather, the court must consider the statement as a whole, including "any implications, inferences, or insinuations that reasonably could be drawn from each statement." <u>Id.</u> at 751.

It is also necessary to evaluate the actual language used, the context, and the "general tenor" of the statement, Steele, 382 F. Supp. 3d at 420, and consider how an objective, reasonable listener would understand the statement. Edwards v. Schwartz, 378 F. Supp. 3d 468, 508 (W.D. Va. 2019).

Here, the statements at issue were clearly made publicly, and for the purposes of summary judgment, Kamras is not arguing that the statements are true or that they lack the requisite sting to be defamatory. See Mot. Summ. J. at 19-27, ECF No. 34. Therefore, for the purposes of assessing Kamras' motion for summary judgment on the defamation counts, the only question is whether Kamras' statements could be reasonably interpreted to declare or imply untrue facts.

### a.   July 30 Statement

On July 30, 2018, Kamras read a statement to reporters regarding the findings of the Carver Report:

> [1] It [the VDOE Report] presents abundant evidence of what amounts to cheating by a small group of adults on the SOL examinations for the past several years at Carver.
>                                    ***
> [2] Cheating is unacceptable. Full stop. Above all else, my administration will be one of integrity—which, as one of my favorite elementary teachers so aptly put it, means doing the right thing even when no one is looking. We ask this of our students; the least we can do is model it ourselves.
>                                    ***
> [3] What most disturbs me about what occurred at Carver is that it effectively robbed our young people of the opportunity to demonstrate their learning free from

suspicion. In doing so, it helped perpetuate pernicious
stereotypes about what children from low-income
families and children of color can achieve.
***
[4] With those suspicions now confirmed, corrosive
biases about our students, as well as the inequities
that flow from them, have the potential to become even
more ingrained in our city.

Ex. 52 at 1, ECF No. 34-53. The Court finds that paragraph 1 is factual, and paragraphs 2-4 are opinions. In paragraph 1, Kamras clearly states that a small group of adults were involved in "cheating" during the SOL examinations for "the past several years at Carver." The Carver Report did not use the word "cheating," and it did not refer to SOL examinations for multiple years. See Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶¶ 14, 15, ECF No. 38. Whether adults at Carver "cheated" over several SOL examinations for several years is factual information that could be proven or disproven within the context of a defamation lawsuit.

Paragraph 2 is non-actionable opinion in that it expresses Kamras' views on cheating and not on anything having to do with Plaintiffs. Moreover, there is no reasonable inference to be drawn other than that Kamras believes that the irregularities in the 2018 SOL testing amounted to cheating—which is exactly what he explicitly said in paragraph 1.

Paragraphs 3 and 4 are also unactionable opinion. Kamras uses hyperbolic rhetorical language like "robbed our young people," "pernicious stereotypes," and "inequities that flow"

39

from "corrosive biases."  Moreover, it is not possible within the context of a defamation lawsuit to prove that "pernicious stereotypes" or "corrosive biases" were perpetuated. Cf. Icenhour v. Town of Abingdon, No. 1:19-cv-33, 2020 WL 534055, *17-18 (W.D. Va. Feb. 3, 2020).  In Icenhour v. Town of Abingdon, the court found that no reasonable listener would treat a claim regarding community sentiment (i.e., "the citizens don't trust the Town") — in a town with thousands of people — as being based on anything other than opinion and "perhaps a few anecdotal conversations with an unrepresentative sample of Town citizens." No. 1:19-cv-33, 2020 WL 534055, *17-18 (W.D. Va. Feb. 3, 2020). In the context of a defamation lawsuit, there is no way to measure whether anything has "perpetuated" a stereotype or whether a "corrosive bias" has become more ingrained in a community like Richmond with over 200,000 residents.

### b.    July 30 Press Conference

After reading his July 30 statement, Kamras answered several questions from reporters.  Br. Supp. Mot. Summ. J. ¶ 32, ECF No. 34.  First, in response to a question about "whether he believed the 'cheating' was done 'intentionally' or was the product of 'mistakes' or not following protocol," Kamras stated:

> [5] "Based on the evidence in the report, I don't
> see any other conclusion than it was intentional."

Ex. 52 at 1, ECF No. 34-53.  Second, in response to a question

about what would happen to the small group of adults involved, Kamras stated, "I can't comment on personnel matters."  Answer ¶ 22, ECF No. 13.  Third, in response to a question about how many individuals were involved, Kamras said, "I would refer you to the report on that. It lists the individuals who were involved."  Answer ¶ 22, ECF No. 13; accord FAC ¶ 22, ECF No. 11.  Finally, in response to a question about who Kamras blamed for the fact that Carver would likely not be accredited in the upcoming year, Kamras said:

> [6] "I blame the individuals who misguided our students."

Ex. 52 at 1, ECF No. 34-53.  The Court finds that paragraph 5 is actionable opinion, but paragraph 6 is unactionable opinion, and in any case, it likely does not have the sufficient "defamatory sting" to be actionable.

Paragraph 5 is actionable in large part because the Carver Report does not take a stand on whether the "irregularities" at Carver were intentional or the product of not following protocol. See Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶ 16, ECF No. 38.  Kamras is an education professional who is the Superintendent of the Richmond Public School System and ultimately the supervisor of the individuals named in the Carver Report.  His words carry weight and are unsupported by the Report.  Baylor v. Comprehensive Pain Mgmt. Centers, Inc., No. 7:09-CV-00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011) (citing Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 4:3.2 (4th ed. 2010)).

41

In paragraph 6, Kamras was asked who he blamed for Carver losing its accreditation, and he simply said that he blamed the "individuals who misguided our students." Here, Kamras was clearly asked to give his opinion on the matter. Moreover, the only reasonable inference from that statement is that "the individuals who were involved" were tied to Carver's loss of accreditation. Unlike a claim that someone is a "cheater," which carries a clear reputational harm, it is not clear that a claim that someone was responsible for a loss of a school's accreditation is an attack on that individual's character. Therefore, the Court finds that paragraph 6 is an unactionable opinion.

### c. August 1 Statement

On August 1, 2018, Kamras attended a public meeting at Carver to discuss the Carver Report. FAC ¶ 24, ECF No. 11; Answer ¶ 24, ECF No. 13. Before the meeting, Kamras read a statement to reporters:

> [7] "I want to reiterate that what happened at Carver is unconscionable. The adults who orchestrated this systemic cheating violated a sacred trust with our students and our families."
>                          ***
> [8] "To be direct: pending Board approval, I can confirm that no one who participated in the cheating scandal will be employed by RPS when the new school year begins. Moreover, pending State approval, I can confirm that none of these individuals will hold a teaching or administrative license in the Commonwealth."

Ex. 52 at 1, ECF No. 34-53.  The Court finds that paragraph 7 is an actionable opinion, and paragraph 8 is a factual statement.

Paragraph 7 contains hyperbolic language like "unconscionable" and "sacred trust" that, if made by a different speaker, might be indicative of a pure opinion; however, Kamras is the Superintendent of the Richmond Public School System and ultimately the supervisor of the individuals named in the Carver Report.  As such, a reasonable listener could interpret Kamras' statement to be based on facts that the listener is not privy to. See Baylor v. Comprehensive Pain Mgmt. Centers, Inc., No. 7:09-CV-00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011).  This is particularly true given that the Carver Report does not use the words "orchestrated," "coordinated," or "cheating."  Pls. Mem. Opp'n Defs.' Mot. Summ. J. ¶¶ 15,17, ECF No. 38. In the context of Kamras' previous statements on July 30 and his statements during the August 1 meeting, it is clear that the "adults" referenced in paragraph 7 are the individuals named in the Carver Report, including Plaintiffs.

Paragraph 8 is clearly factual in nature and defamatory to the extent that it implies that anyone who RPS recommended for termination or license revocation was necessarily involved in "the cheating scandal" at Carver.  Whether the individuals for whom negative employment actions are sought were involved in "cheating," is something that can be proven or disproven in the context of a defamation lawsuit.

### d.   August 1 Public meeting

Also on August 1, 2018, Kamras spoke at the public meeting regarding the Carver Report.  There, Kamras stated:

> [9]  "The actions of a few adults here were so unconscionable because their actions have now perpetuated the belief that a child from Carver can't be honor roll."

Ex. 52 at 2, ECF No. 34-53.  And Kamras was further reported to have said

> [10] that he blamed all of the named individuals collectively for the "effects" of the Report and the fact that "now there is a cloud" over Carver's academic integrity.

Ex. 52 at 2, ECF No. 34-53.  The Court finds that paragraph 9 is purely an opinion but paragraph 10 is actionable opinion by virtue of an implied statement of fact.

Paragraph 9 employs language that is hyperbolic ("unconscionable") and rhetorical ("a child from Carver can't be honor roll").  A reasonable listener would interpret paragraph 9 as Kamras stating his opinion which could not be based on more than anecdotal discussions with a non-representative sample of community members.  See Icenhour v. Town of Abingdon, 2020 WL 534055, *17-18 (W.D. Va. Feb. 3, 2020).  In the context of a defamation lawsuit, there is no way to measure whether anything has "perpetuated" a "belief" in a community with over 200,000 residents.

Paragraph 10 is similarly hard to measure except that Kamras specifically stated that he "blamed all of the named individuals

collectively." There would be no way, in the context of a defamation lawsuit, to measure whether "there is a cloud over Carver's academic integrity." And Kamras' statement about who he blames for the fallout of the public announcement of the testing irregularities at Carver is his opinion. However, there is a clear implication from paragraph 10: the individuals named in the Carver Report were involved in, and at least partially responsible for, what Kamras described before the meeting as a "cheating scandal." Because Kamras is the Superintendent of the Richmond Public School System and ultimately the supervisor of the individuals named in the Carver Report. A reasonable listener could interpret Kamras' statement to be based on facts that the listener is not privy to. See Baylor v. Comprehensive Pain Mgmt. Centers, Inc., No. 7:09-CV-00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011). Whether what happened was "cheating" and whether every individual named in the Report was involved are factual matters that can be determined in the context of a defamation lawsuit.

### e.   News Article

Kamras was quoted in an article published by the Richmond Times Dispatch on August 1, 2018 titled "UPDATED: Richmond Public Schools recommends ousting 10 members of Carver cheating ring, license revocation." Ex. C, ECF No. 11-3. In the article, in response to a question about why he decided to announce the employment recommendation, Ex. AA, ECF No. 39-27, Kamras is quoted as saying:

[11] "The public needs to know that there are consequences to these actions."

Ex. 52 at 2, ECF No. 34-52.  Before he answered questions from reporters after the meeting, Kamras had publicly stated, "[P]ending Board approval . . . no one who participated in the cheating scandal will be employed by RPS when the new school year begins. Moreover, pending State approval . . . none of these individuals will hold a teaching or administrative license in the Commonwealth."  Ex. 52 at 1, ECF No. 34-52.  Given that context, paragraph 11 is not actionable in itself so much as evidence of Kamras' reasons for announcing the employment recommendation. Paragraph 11 cannot, itself, be proven true or false, so it is not actionable.  To the extent that there is an implied statement of fact in paragraph 11, it is what Kamras explicitly said in paragraph 8: he is recommending employment consequences for the individuals who "cheated."

## 2. Qualified Privilege

Under Virginia law, there is a "qualified privilege" that protects "[c]ommunications between persons on a subject in which the persons have an interest or duty." Larimore v. Blaylock, 528 S.E.2d 119, 121 (Va. 2000).  Whether a communication is covered by the qualified privilege is a question of law.  Cashion v. Smith, 749 S.E.2d 526, 532 (Va. 2013).  The privilege is clearly applicable in employment contexts where a defamatory statement was

46

"made between co-employees and employers in the course of employee disciplinary or discharge matters." Larimore, 528 S.E.2d at 121; see also Thalhimer Bros., Inc. v. Shaw, 159 S.E. 87, 89 (Va. 1931) ("The modern authorities hold that a communication containing defamatory matter made to a business associate or servant in the ordinary and natural course of business is not actionable."). However, even assuming, arguendo, that Kamras had a duty to speak to the public regarding the testing irregularities at Carver, Kamras has not cited (nor was the Court able to find) case law suggesting that the qualified privilege can apply between a supervisor (e.g., Kamras) and non-employees (e.g., the general public) outside of a formal hearing merely because both parties are interested in a public scandal that happened to involve employee discipline.  In fact, there is case law that suggests the opposite.  See Baylor v. Comprehensive Pain Mgmt. Centers, Inc., No. 7:09-CV-00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011) (finding no qualified privilege between a medical provider and the patients of a former employee of the medical provider).  Because Kamras has also failed to offer any rationale for extending the qualified privilege to this context, the Court finds that the qualified privilege does not apply in this situation.  There is, therefore, no need to address Plaintiffs' arguments that they have overcome the qualified privilege.

### 3. Statutory Immunity

Ordinarily, the requisite intent that a plaintiff must prove to make out a claim for defamation would vary based on whether the plaintiff is a private figure or a public figure. Where the plaintiff is a private figure, he or she would typically need to "show that the defendant knew that the statement was false, or believing that the statement was true, lacked a reasonable basis for such belief, or acted negligently in failing to determine the facts on which the publication was based." Hyland v. Raytheon Tech Servs. Co., 670 S.E.2d 746, 750 (Va. 2009). Where the plaintiff is a public figure, he or she would need to show by "clear and convincing proof that the defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for the truth." Gertz v. Robert Welch, 418 U.S. 323, 342 (1974).

However, in 2017, Va. Code § 8.01-223.2 was amended to grant a form of "immunity" to persons alleged to have made certain defamatory statements regarding matters of public concern:

> A person shall be immune from civil liability for . . . a claim of defamation based solely on statements (i) regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party . . . . The immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.

Va. Code § 8.01-223.2(A); compare Va. Code § 8.01-223.2 (2016) with Va. Code § 8.01-223.2(A) (2017). Because the relevant portions of the statute were added approximately three years ago, courts have not extensively analyzed the new language.[12] For example, courts have not considered whether statutory immunity under Va. Code Ann. § 8.01-223.2(A) is "coextensive with Virginia common-law qualified immunity." Icenhour v. Town of Abingdon, 1:19-cv-33, 2020 WL 534055, *5 (W.D. Va. Feb. 3, 2020). Similarly, the Court has not found cases directly addressing (1) the standard of proof for showing that immunity under Va. Code § 8.01-223.2(A) attaches (or is overcome) or (2) which party bears the burden of making that showing. But see Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC, 821 Fed. Appx. 234, 235, 238 (4th Cir. 2020) (per curiam) (affirming lower court decision which held that the plaintiff "failed to show that the immunity provision of Virginia Code section 8.01-223.2 did not apply to" the allegedly defamatory statements); Gilmore v. Jones, 370 F. Supp. 3d 630, 682 (W.D. Va. 2019) (finding that statutory immunity did not attach because the plaintiff had plausibly alleged defamation with actual malice). In the absence of clear guidance from the Virginia General

---

[12] But, even prior to the 2017 amendments, the Court is only aware of one case that cited the earlier version of Va. Code § 8.01-223.2, and it is of little use here. See Smithfield Foods, Inc. v. United Food & Commer. Workers Int'l Union, 593 F. Supp. 2d 840 (E.D. Va. 2008) (Payne, J.).

Assembly,[13] the Court will look to the closest common law analogue: the qualified privilege.  <u>See</u> <u>supra</u> Part III.B.2

The Supreme Court of Virginia has recognized that, in a defamation case, the question of whether a qualified privilege attaches is a matter of law.  <u>Cashion v. Smith</u>, 749 S.E.2d 526, 532 (Va. 2013).  Once the qualified privilege attaches, the plaintiff bears the burden to prove that the privilege has been lost or abused by virtue of the defendant's improper mental states (e.g., personal spite or ill will).[14]  <u>Cashion</u>, 749 S.E.2d at 532. Whether the defendant acted with an improper mental state is a question of fact for a jury.[15]  <u>Cashion</u>, 749 S.E.2d at 533.

The analytical format for interpreting Va. Code § 8.01-223.2 then follows the Supreme Court of Virginia's model for qualified privilege.  Thus, here, as there: (1) the question of whether statutory immunity attaches is a question of law; (2) the plaintiff bears the burden for showing that statutory immunity is lost by virtue of the defendant's mental state; (3) whether the privilege

_____

[13] The Court did not find legislative history clarifying the standard of proof or burdens applicable to Va. Code § 8.01-223.2(A).

[14] This approach tracks the way in which the Fourth Circuit appeared to handle the parties' burdens under Va. Code § 8.01-223.2(A). <u>See</u> <u>Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC</u>, 821 Fed. Appx. 234, 235, 238 (4th Cir. 2020) (per curiam).

[15] This approach is also consistent with federal case law noting that summary judgment is rarely appropriate where a party's mental state is a central element of a claim or defense.  <u>Ballinger v. North Carolina Agricultural Extension Service</u>, 815 F.2d 1001, 1005 (4th Cir. 1987).

is overcome by virtue of the defendant's improper mental states (i.e., a reckless disregard for the truth or actual or constructive knowledge of a statement's falsity) is a jury question; and (4) to defeat an assertion of statutory immunity, the plaintiff must show, by clear and convincing evidence, that the defendant acted with an improper mental state.

Here, the Court finds that statutory immunity does attach to the statements made by Kamras; however, the question of whether Kamras lost that immunity by virtue of an improper mental state is a question of fact that should go to a jury.

Plaintiffs argue that statutory immunity does not attach because Kamras' statements were not on matters of public concern. That argument is belied by the nature of the topic discussed (i.e., the reliability of the city's educational system) and by the intense local media interest in the Carver scandal and the persons responsible for it. See Pls. Mem. Opp'n Defs.' Mot. Summ. J, ECF No. 38 ¶ 47. Although the termination of a private employee by a private employer may not be a matter of public concern, see Great Coastal Express v. Ellington, 334 S.E.2d 846, 848-849, 852 (Va. 1985), allegations that public school teachers coached public school students to cheat on state examinations are a matter of public concern.

Because the Court finds that statutory immunity does attach – and because Kamras' mental state during the time that he made

the allegedly defamatory statements is in contention – the question of whether the statements were made with reckless disregard for their truth or constructive knowledge[16] of their falsity will go to a jury.  Cf. Cashion v. Smith, 749 S.E.2d 526, 533 (Va. 2013).

## CONCLUSION

For the foregoing reasons, the MOTION FOR SUMMARY JUDGMENT (ECF No. 33) will be GRANTED with respect to plaintiffs Alexis and Cotman's liberty interest claims, DENIED with respect to plaintiff Stephanie Burgess' liberty interest claim, and DENIED with respect to all three Plaintiffs' defamation claims.

It is so ORDERED.

_____ /s/     REP_____

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: December **3** , 2020

_____

[16] Plaintiffs have made no allegation that Kamras' statements were made with actual knowledge of their falsity.

52